■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM RAMOS, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (Kramer, J.), rendered April 25, 1985, as amended May 16, 1985, convicting him of criminal possession of a controlled substance in the first degree and criminal possession of a weapon in the third degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment, as amended, is reversed, on the law, and a new trial is ordered; the facts have been considered and are determined to have been established.

The defendant was arrested as he exited a third floor Brooklyn "drug factory" apartment in which cocaine, various pieces of drug paraphernalia and numerous weapons were found. The defendant, who described himself as a drug addict, denied any connection with the apartment in which the contraband was found, stating that he had come to the building to purchase cocaine and heroin, and that immediately prior to his arrest he had been in an abandoned apartment next door which served as a "shooting gallery" for drug users. The defendant testified that after injecting himself in the shooting gallery, in which other drug users were present, he heard a shot, which caused those present to disperse. According to the defendant, he fled through the apartment window, walked onto the fire escape and slipped through the window of the adjacent "drug factory" apartment. He was arrested as he exited the locked "drug factory" door. Upon exiting the apartment the defendant stated to the police officers present, "It's okay. The guy with the gun was here but he went". The police found another man was hiding in the bathroom. Five .25 caliber bullets were removed from the defendant's pockets. Among the weapons confiscated from the apartment was a .25

caliber pistol. The defendant was subsequently charged with, and convicted of, criminal possession of a controlled substance in the first degree and criminal possession of a weapon in the third degree.

Based upon certain trial errors, we conclude that the defendant was deprived of a fair trial and, accordingly, reverse. During the prosecutor's cross-examination the defendant was asked, "[t]he guy that sells drugs in that apartment is not named William Ramos, is he?". The defendant replied, "No". Thereafter, the prosecutor asked, with no evidentiary basis or good-faith foundation, "[h]is name is Papo, the guy who sells drugs is Papo?". The defendant denied any knowledge of an individual named "Papo". Thereupon, the prosecutor asked, "[b]y the way your name is 'Papo' isn't it?". The defense counsel objected but the prosecution persisted in questioning the defendant as to whether he was known as "Papo". Subsequently, the prosecutor, holding in his hand a picture of the defendant wearing a sweater inscribed with the name "Papo", again asked the defendant, over counsel's objection as to relevancy, whether he had ever identified himself as "Papo". The defendant then stated that he was known as "Papo Pinya", not "Papo", to which the prosecutor sarcastically replied "Oh!", further remarking that, "[w]hen you saw me with that picture, is that when you remembered you were known as 'Papo Pinya'?".

We condemn this attempt to associate the defendant with drug dealing through the use of unsubstantiated innuendo within the context of a wholly collateral matter. With no evidentiary basis other than that supplied by his own questions, the prosecutor himself suggested that the name "Papo" was synonymous with drug dealing and thereafter—despite the defendant's denials—repeatedly questioned him with respect to the name "Papo". We note, moreover, that the prosecutor's comments with respect to drug dealing are all the more prejudicial since the defendant was charged only with possession. As the Court of Appeals has observed, "the cross-examiner is bound by the witness' answers on such collateral matters" (People v Crandall, 67 NY2d 111, 118). The prejudicial effect of this repeated questioning concerning the collateral "Papo" issue was compounded when the prosecutor—in an attempt to impeach the defendant's testimony—produced a picture of the defendant wearing a sweater inscribed with the name "Papo". Holding the picture as he questioned the defendant, the prosecutor elicited from the defendant that he was known as "Papo Pinya". Through his questions, the prosecutor

suggested to the jury that the defendant had lied about his nickname and that the defendant was, in fact, the "Papo" whose drug dealing had been injected into the case, without foundation, by the prosecutor himself.

Contrary to the contentions of our dissenting colleagues, the defendant's direct testimony to the effect that another individual, not he, actually possessed the narcotics found in the apartment in no way provides an evidentiary basis or justification for the prosecutor's suggestion that an individual named "Papo" was involved in selling drugs. Neither the defendant's direct testimony nor the testimony of any other witness referred to "Papo" or suggested in any fashion that inquiry into the theretofore unmentioned name "Papo" would likely result in the impeachment of the defendant's contention that he had not possessed the narcotics. In light of the foregoing, the prosecutor's questions cannot be characterized as a legitimate attempt to rebut the defendant's direct testimony or to impeach his claims of noninvolvement with the apartment. Rather, the record clearly reveals that the "Papo" issue represented an entirely independent line of inquiry through which the prosecutor, in a possession case, sought to connect the defendant to drug dealing based upon his own unfounded comments and the use of an otherwise innocuous photograph.

Further, the court erred in admitting, over objection, certain rebuttal testimony offered by the People. As the Court of Appeals has observed, "[t]he rules concerning the proper scope of rebuttal evidence are clear. The party holding the affirmative of an issue must present all evidence concerning it before he closes his case. Thereafter, that party may introduce evidence in rebuttal only. 'Rebutting evidence in such cases means, not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the party who began, but evidence in denial of some affirmative fact which the answering party has endeavored to prove' " (People v Harris, 57 NY2d 335, 345, cert denied 460 US 1047, quoting from Marshall v Davies, 78 NY 414, 420). At trial, the defendant testified that he had not resided at the apartment in which the contraband was found, stating instead that, at the time of his arrest he had been living elsewhere, with his brother. He further testified that he knew a woman named Brunhilda Millan and had lived with her for a few weeks at a location other than the subject apartment. He could not recall if he had lived with her in August of 1984. Over the defense counsel's objection that this matter was also collateral, the People called a Detective Jack Godoy in rebuttal, who testi-

fied, *inter alia,* that on the day after the defendant's arrest, he visited the apartment and found Ms. Millan present. Contrary to the People's contentions, Godoy's testimony did not impeach any material portion of the defendant's testimony. Nor was Ms. Millan's presence in the apartment supportive of the contention that the defendant himself lived there. The intended effect of this testimony, as discernible from the prosecutor's questions, was apparently to suggest that Millan's presence somehow connected the defendant to the apartment and thus to the contraband therein. The only purpose of this rebuttal testimony therefore, as the defendant suggests, was to encourage "the jury to speculate about a guilt by association argument".

Contrary to the contention of our dissenting colleagues, Detective Godoy's testimony that he found Brunhilda Millan in the apartment and observed men's clothing therein, did not contradict the defendant's testimony. The defendant testified that while he may have lived with Millan elsewhere in August 1984, he had been living with his brother at the time of his arrest and had never lived in the subject apartment. The fact that someone whom the defendant knew was present in the apartment or that Godoy observed men's clothing therein was of no relevance to the defendant's alleged possession of the controlled substances. In short, we conclude that the combined effect of the foregoing errors deprived the defendant of a fair trial.

We have considered the defendant's remaining contention and find it to be without merit. Lawrence, J. P., Eiber and Kooper, JJ., concur.

Weinstein, J., dissents and votes to affirm the judgment of conviction with the following memorandum, in which Rubin, J., concurs. Upon reviewing the evidence, as I am obliged to do, in a light most favorable to the People, I find the evidence to have been legally sufficient to prove the defendant's guilt of the crimes of criminal possession of a controlled substance in the first degree and criminal possession of a weapon in the third degree, inasmuch as " '*any* rational trier of fact could have found the essential elements of th[ose] crime[s] beyond a reasonable doubt' " *(see, People v Contes,* 60 NY2d 620, 621, quoting from *Jackson v Virginia,* 443 US 307, 319 [emphasis in original]; *accord, People v Patterson,* 121 AD2d 406, 407, *lv denied* 68 NY2d 759). Furthermore, I am of the opinion that the defendant's conviction was not against the weight of the evidence *(see,* CPL 470.15 [5]), since the jury properly discredited the defendant's exculpatory version of the incident and

found instead that he had constructively possessed the subject contraband.

As the record reveals, several police officers responded to a radio report that a man dressed in black and carrying a gun had entered the premises in question. That location was a six-family dwelling which was approximately half occupied and half abandoned. As the police entered the building, which was completely dark, they heard someone running up a staircase. In the course of conducting a floor-by-floor search of the premises, the officers were informed by a female occupant that a man with a shotgun was upstairs. They were later informed by spectators on the street below that someone had appeared on the fire escape. After proceeding onto the fire escape, two of the officers entered a room which appeared to be occupied. One of the officers heard a door slam as he entered the room. He thereafter observed brass bullet casings, shotgun shells, weight machines and bottles situated on a table. Upon hearing a noise in the bathroom, the officer drew his gun and ordered the occupant, who was the codefendant Garcia, to come out. Two other officers had meanwhile observed the defendant emerge from the locked apartment and slam the door shut behind him. The defendant volunteered the following information: "It's okay. The guy with the gun was here but he went". As the officers proceeded to question the defendant, the door to the apartment opened and an officer stated: "We have another one, he's in the bathroom". The officers who had apprehended the defendant thereupon entered the apartment and conducted a search, which revealed a sawed-off shotgun, a .22 caliber rifle and a Colt .25 automatic, all of which were loaded and operable. The police observed, in plain view atop one of the stereo speakers, a round food tin with its lid partially ajar. Inside the tin was a clear plastic bag containing a powdery substance. The substance was subsequently determined to contain cocaine. A quantity in excess of 4⅜ ounces was retrieved. That quantity had a street value of approximately $50,000. Additionally, five .25 caliber bullets were seized from the defendant's person.

The defendant claimed to have been at the subject premises solely for the purpose of purchasing cocaine and heroin for his own use. As he was in the shooting gallery, the defendant heard a gunshot and observed all the occupants flee through the hallway and down the fire escape. Significantly, none of the officers encountered any of these fleeing persons. The defendant claimed to have traveled via the fire escape into the apartment where the drugs and weapons were found because

he "got very nervous". He was apprehended by the police as he attempted to leave that apartment. The defendant claimed to have procured the bullets, which the police found on his person, from a table in the shooting gallery.

Under the circumstances, the defendant's apparently specious and unsolicited assertion to the police to the effect that the man they were looking for had left was properly construed by the jurors as an attempt on his part to avoid capture and to prevent the police from entering the apartment and discovering the contraband. The People's reliance upon the statutory presumption of knowing possession contained in Penal Law § 220.25 (2) was not misplaced in the instant situation. It is uncontroverted that the defendant emerged from the apartment immediately prior to his apprehension by the police thereby establishing the requisite close proximity to the contraband seized. Furthermore, the presence of the balance scales, bottles and other paraphernalia in the apartment cogently evinces the intent to unlawfully prepare the drugs for sale and the discovery of the cocaine in a partially opened food tin on top of the stereo speaker was sufficient to satisfy the open-view requirement (cf., People v Rodriguez, 104 AD2d 832, 834-835).

Nor do I find grounds for reversal in the prosecutor's cross-examination of the defendant with respect to the name "Papo" or in the trial court's admission of the People's rebuttal testimony. The trial court is vested with authority, to be exercised in its sound discretion, to determine the permissible scope of cross-examination in each particular case (see, People v Dickman, 42 NY2d 294, 297). In the instant case, the trial court did not abuse its discretion with respect to the "Papo" line of inquiry inasmuch as the defendant, on direct examination, had raised the issue of whether some unknown seller who was present in the apartment had actually owned and possessed the drugs. The prosecutor's questions sought to discredit the defendant's contention that the drugs found in the apartment belonged to this unknown seller. In effect, the prosecutor sought to induce the defendant to identify this fictitious seller or to explain how that person had managed to elude the police. The prosecutor then went on to question the defendant concerning his nickname "Papo". After initially denying his use of the name, the defendant admitted being known as "Papo Pinya" only after the prosecutor displayed a picture of the defendant wearing a sweater bearing the name "Papo". To this extent, the prosecutor was properly permitted to use the picture for the limited purpose of refreshing the

defendant's recollection. When the prosecutor attempted to have the picture admitted into evidence, the trial court properly denied its admission on the ground that it was extrinsic evidence of collateral matter offered for the sole purpose of impeaching the defendant's credibility *(see, People v Strawder,* 106 AD2d 672, 673).

Moreover, it was not improper to have admitted the rebuttal evidence in order to refute the defendant's contention that since he had never been in the drug-factory apartment, he did not possess the drugs or the weapon. Specifically, the defendant had admitted on direct examination that he previously resided with Brunhilda Millan but denied ever having lived at the scene of the crime. The People's rebuttal evidence, which established that a detective had gone back to the subject apartment after the defendant's arrest and had observed Brunhilda Millan as well as an assortment of men's and women's clothes there, touched on precisely these points. This testimony was significant in view of the defendant's prior testimony that he could not recall whether he had been residing with Brunhilda during the month of his arrest.

In any event, any potential error attributable to the prosecutor's cross-examination of the defendant or to the court's ruling concerning the admission of the rebuttal evidence was harmless in view of the overwhelming evidence of guilt *(People v Crimmins,* 36 NY2d 230).