THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JULIO PEGUERO-SANCHEZ, Appellant. [35 NYS3d 423]—

Appeal by the defendant from a judgment of the Supreme Court, Suffolk County (Condon, J.), rendered February 25, 2014, convicting him of criminal possession of a controlled substance in the first degree and improper equipment of a vehicle (two counts) (Vehicle and Traffic Law § 375 [2] [a] [4]; [10] [a]), upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress physical evidence.

Ordered that the judgment is modified, on the law, by vacating the conviction of improper equipment of a vehicle under count two of the indictment (Vehicle and Traffic Law § 375 [10] [a]), and the sentence imposed thereon, and dismissing that

count of the indictment; as so modified, the judgment is affirmed.

At approximately 6:59 p.m. on November 10, 2011, the defendant was arrested in an Applebee's parking lot in Lindenhurst. He was charged with criminal possession of a controlled substance in the first degree and improper equipment of a vehicle (two counts) (Vehicle and Traffic Law § 375 [2] [a] [4]; [10] [a]). At trial, the arresting officer and the defendant each testified and presented markedly different versions of the facts prior to and after the arrest.

The arresting officer testified at a *Mapp/Dunaway* hearing (*see Mapp v Ohio*, 367 US 643 [1961]; *Dunaway v New York*, 442 US 200 [1979]) and at trial that on the date of the incident, he was patrolling an area where there had been public complaints about, and arrests for, drug dealing, when he observed a BMW vehicle (hereinafter the vehicle) with its engine running but with no illuminated license plate. He also observed the defendant in the driver's seat. As the officer circled the vehicle, he noticed that the vehicle did not have a rear-view mirror. The officer testified that when he made eye contact with the defendant, the defendant reclined his seat and slid down in the seat. The officer parked his patrol vehicle, approached the defendant's vehicle, and asked the defendant what he was doing. The defendant appeared nervous and replied that he was meeting friends and going to Applebee's. The officer then asked to see the defendant's driver license. After the defendant turned on the interior lights of the vehicle to retrieve his driver license, the officer observed an open black plastic bag between the defendant's feet. The officer observed, on top of the bag and in plain view, several sealed clear plastic bags containing "large white rock substances."

The defendant, in contrast, testified at trial that while he was walking to Applebee's, he was approached by the arresting officer, who asked for the defendant's driver license, made an inappropriate remark, and then placed the defendant under arrest. While the defendant was seated in the patrol vehicle, the officer took the key to the defendant's vehicle from the defendant's pocket, opened the doors and trunk to the defendant's vehicle, and searched the vehicle. The defendant was advised 15 minutes later that his arrest was for drugs. The defendant denied the presence of plastic bags in the vehicle, denied that his vehicle's rear-view mirror was missing, and denied any knowledge of drugs in the vehicle. The defendant explained that he often loaned the vehicle to the employees of his barber business, but did not recall who had last borrowed

it. He also testified that, minutes before his arrest, he had been texting his girlfriend about meeting her at Applebee's.

During the trial, the Supreme Court permitted the People, over the defendant's objection, to introduce as rebuttal evidence a chart of text messages that had been retrieved from the defendant's cell phone. The text messages consisted of a conversation with another person about a meeting, and language in the text messages indicated that the other person was a male referred to as "little brother."

At another point in the trial, a detective who inventoried the plastic bag recovered from the defendant's vehicle testified, on cross-examination, that DNA on the bag could have belonged to anyone who the defendant had been "dealing with." The Supreme Court denied the defendant's request for a mistrial based upon the detective's statement.

During summation, the prosecutor made reference to, without defense objection, "coded and secretive" language contained in the text messages recovered from the defendant's cell phone. The defendant was convicted of criminal possession of a controlled substance in the first degree and improper equipment of a vehicle (two counts) (Vehicle and Traffic Law § 375 [2] [a] [4]; [10] [a]).

On appeal, the defendant argues that the Supreme Court erred in failing, at the pre-trial hearing, to suppress the cocaine recovered at the scene of the arrest, and at trial, in admitting the chart of text messages as rebuttal evidence because they pertained merely to a collateral matter. The defendant also argues that his defense was prejudiced by the mention at trial of uncharged cocaine sale crimes, consisting of the detective's testimony regarding who the defendant had been "dealing with" and the prosecution's summation implying that the defendant was a cocaine seller.

The Supreme Court properly denied that branch of the defendant's omnibus motion which was to suppress physical evidence. Where, as here, a police officer has probable cause to detain a motorist in his vehicle for a traffic violation, such a seizure is reasonable even though the underlying reason for the stop may have been to investigate some other matter (*see Whren v United States*, 517 US 806 [1996]; *People v Robinson*, 97 NY2d 341 [2001]; *People v Davis*, 103 AD3d 810, 811 [2013]; *People v Ortiz*, 265 AD2d 579 [1999]; *People v Dougherty*, 251 AD2d 344 [1998]). In this case, the court's determination crediting the evidence presented by the People at the *Mapp/Dunaway* hearing, that the defendant was lawfully detained for a traffic violation when the police officer observed cocaine in plain view

on the floor of the vehicle in which the defendant was seated, is supported by the record. Accordingly, the cocaine was lawfully seized (*see Wong Sun v United States*, 371 US 471, 488 [1963]; *People v Edwards*, 82 AD3d 1005 [2011]).

Regarding the trial evidence, the text messages were properly admitted into evidence on the People's rebuttal case and not to impeach the defendant's credibility on a mere "collateral" matter. The testimony of the arresting officer and the defendant were so diametrically opposed to each other regarding the circumstances of the arrest that they could not be reconciled absent a determination that one version was essentially true and the other version essentially false. The arresting officer testified that the defendant told him that he was meeting friends and going to Applebee's. The defendant, in contrast, testified that, minutes before his arrest, he was texting his girlfriend about meeting her at Applebee's. The defendant also denied referring to his girlfriend as "brother." In the text messages, the defendant referred to their recipient as "little brother," and the recipient referred to the defendant as "old man." The language of the text messages corroborated the officer's testimony that the defendant had stated at the scene that he was meeting friends at Applebee's and not, as the defendant had testified, texting his girlfriend. Since the defendant's overall testimony placed the arresting officer's credibility at issue, and the defendant had opened the door to the nature of the text messages, they were properly admissible on rebuttal for their probative value in enabling the jury to assess the officer's credibility (*see People v Harris*, 57 NY2d 335, 345 [1982]). Indeed, as noted by the Court of Appeals, rebuttal evidence is "not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the [rebutting] party who began, but evidence in denial of some affirmative fact which the answering party has endeavored to prove" (*id.* at 345). Here, the arresting officer, through his testimony, sought to establish his conversation with the defendant at the scene as part of the overall sequence of events, including the defendant's representation at that time that he was waiting to meet friends at the restaurant. Thus, the text messages were properly admitted as rebuttal evidence to corroborate the nature of that conversation which the defendant, during his own testimony, had refuted.

Contrary to the defendant's contention, the detective's testimony on cross-examination regarding whom the defendant may have been "dealing with" did not accuse the defendant of selling cocaine, for which he was not charged. Rather, the state-

ment, taken in context, necessarily and innocuously referred to the person from whom the defendant allegedly obtained the bags of cocaine.

The prosecutor's summation provides no basis for reversing the judgment. Defense counsel made no objections during the summation and, thus, any summation-related arguments made on appeal are unpreserved (see CPL 470.05 [2]; People v Ricketts, 125 AD3d 893 [2015]). In any event, contrary to the defendant's contentions, the prosecutor did not argue that based on the text messages the defendant was a cocaine seller. Rather, the prosecutor appropriately argued that the coded language in the text messages helped to establish that the defendant knowingly possessed cocaine, an offense with which he had been charged, and helped to refute the defendant's contention that the cocaine had merely been unwittingly left in the car by one of his employees.

The People correctly concede that the defendant's conviction for violating Vehicle and Traffic Law § 375 (10) (a) cannot be sustained. An indictment must provide a defendant with fair notice of the charges against him or her (see People v Keindl, 68 NY2d 410, 416 [1986]; People v Morris, 61 NY2d 290, 293 [1984]). Here, count two of the indictment failed to provide the defendant with fair notice that he was being charged with violating Vehicle and Traffic Law § 375 (10) (a). Accordingly, the defendant's conviction for a violation of Vehicle and Traffic Law § 375 (10) (a) must be vacated, and count two of the indictment dismissed.

The defendant's remaining contentions are without merit. Dillon, J.P., Dickerson and Roman, JJ., concur.

Austin, J., concurs in part and dissents in part, and votes to modify the judgment, on the law, by vacating the conviction of improper equipment of a vehicle under count two of the indictment (Vehicle and Traffic Law § 375 [10] [a]), and the sentence imposed thereon, and dismissing that count of the indictment, and by vacating the conviction of criminal possession of a controlled substance in the first degree, and the sentence imposed thereon, and remitting the matter to the Supreme Court, Suffolk County, for a new trial on that count of the indictment, and, as so modified, to affirm the judgment, with the following memorandum, in which Barros, J., concurs: At the outset, I agree that the evidence well establishes the defendant's guilt of criminal possession of a controlled substance in the first degree. Where I part company with the majority is that the defendant did not receive a fair trial in reaching that conclusion. Accordingly, I respectfully dissent and vote to

reverse the defendant's conviction of that count and remit the matter to the Supreme Court, Suffolk County, for a new trial on that count.

The defendant was charged and convicted of criminal possession of a controlled substance in the first degree and improper equipment of a vehicle (two counts) (Vehicle and Traffic Law § 375 [2] [a] [4]; [10] [a]). The People correctly concede, and the majority notes, that the defendant's conviction for violating Vehicle and Traffic Law § 375 (10) (a) cannot be sustained, as count two of the indictment failed to provide the defendant with fair notice that he was being charged with violating Vehicle and Traffic Law § 375 (10) (a) (see People v Keindl, 68 NY2d 410, 416 [1986]; People v Morris, 61 NY2d 290, 293 [1984]). Thus, the defendant's conviction of that count must be vacated, and count two of the indictment dismissed.

The charge of criminal possession of a controlled substance in the first degree was prosecuted with the undeniable theme of criminal sale of a controlled substance. The cumulative effect of the cocaine dealing references in the unchecked testimony and proof, as well as the People's summation, warrants reversal. In addition, the admission of a chart with unredacted, translated text messages from the defendant's cell phone, starting the night before the arrest, purportedly setting up a meeting with a third-party male in coded language, unfairly prejudiced the defendant and greatly contributed to the improper overarching criminal sale theme pursued by the prosecution.

At trial, the arresting officer testified that, on November 10, 2011, a few minutes before 7:00 p.m., he was patrolling a large shopping center in Lindenhurst, where there had been complaints about, and arrests for, "drug dealing," when he spotted the defendant's parked vehicle with its engine running. The arresting officer observed that the license plate light was not illuminated. The arresting officer also noticed that the rear-view mirror was missing as he circled the defendant's vehicle in his own patrol vehicle.

When the arresting officer's unmarked patrol vehicle was approximately 10 feet away from the defendant's vehicle, the defendant slid down in the front seat after the officer made eye contact with him. This action caused the arresting officer to become suspicious. As a result, the arresting officer parked his patrol vehicle, approached the defendant's vehicle, and asked the defendant what he was doing.

While requesting the defendant's driver license, the arresting officer saw a black plastic bag containing small sealed clear

plastic bags filled with a large white rocklike substance on the floor between the defendant's legs. After the defendant was placed in the arresting officer's patrol vehicle, the arresting officer searched the defendant's vehicle and recovered the black plastic bag and a separate paper bag from under the driver's seat which contained what was later determined to be cocaine.

At the beginning of the arresting officer's testimony, the prosecutor asked the officer a series of questions concerning his experience with the sale of narcotics. The prosecutor asked if the arresting officer was "generally familiar with street level narcotics trafficking," to which he responded "yes." The prosecutor then asked if the arresting officer had ever "done surveillance on homes out of which narcotics are sold," "done surveillance of suspects selling cocaine," "debriefed people who sell cocaine," "debriefed people who buy cocaine," and "assisted in the execution of search warrants on homes and cars [out] of which narcotics are sold." The arresting officer responded "yes" to all of these questions. The prosecutor also inquired about the arresting officer's familiarity with "the way that street level narcotics are packaged," "the prices and quantities that narcotics are sold in, specifically cocaine," and "the price of a kilogram of cocaine." Defense counsel objected to these questions on the basis of relevance but the objection was overruled. The prosecutor continued to ask about the street value of a gram of cocaine.

Following a dozen questions about the arresting officer's experience with narcotics sales, the prosecutor finally questioned the arresting officer about his experience with the crimes with which the defendant was charged. The prosecutor asked the arresting officer if he had ever made car stops, if he made car stops involving narcotics possession, and approximately how many car stops involving narcotics possession had he made.

The prosecution also called as a witness the detective who had processed the black plastic bag recovered from the defendant's vehicle. The detective stated that the DNA on the bag could have belonged to anyone who the defendant had been "dealing with." The defense moved for a mistrial, arguing that the detective's answer suggested the defendant was a cocaine dealer. The Supreme Court denied the defendant's motion, which emboldened the prosecutor to pursue the cocaine sale theory even further.

On his case-in-chief, the defendant testified that he had stopped at the subject shopping center to get something to eat. He recalled that, after he parked his car and as he was walk-

ing to a nearby Applebee's, the arresting officer stopped and detained him. The defendant denied that the cocaine was his and testified that he loaned his car to employees of his barber shop business on a regular basis.

In a series of questions during cross-examination, which started with the question "[w]ere you planning on meeting someone at the Applebee's to eat or did you just go by yourself?," the defendant claimed that, prior to being arrested, he was texting with his then-girlfriend about meeting her for dinner. He stated that his then-girlfriend's name in his phone contacts was "Bibian" but that she had a second phone with a different phone number.

When the prosecutor asked if "[a]nyone call[ed] you asking for cocaine?," the defendant responded, "Never. I never sell . . . I don't sell cocaine." Apparently recognizing the impropriety of the question, the prosecutor then struck the question. However, the damage was already done.

During the People's rebuttal case, over the defendant's objection, the prosecutor offered into evidence a chart showing 46 text messages received and sent from the defendant's cell phone to and from a person identified as "Bb!!pul" starting the day before and continuing on the day of his arrest. The chart included the date and time, contact name and number of the recipient, and, significantly, the content of the text messages translated from Spanish. There was no evidence provided as to who translated the text messages into English from Spanish. At the beginning of the trial, the Supreme Court had granted the defendant's application to preclude the People from introducing this document during its case-in-chief.

After the defendant testified, the Supreme Court admitted this nine-page chart into evidence as "relevant strictly with respect to the defendant's credibility" to rebut the defendant's testimony that he had been texting his then-girlfriend, one of whose cell phone numbers was saved under the name "Bibian" in his phone, prior to being arrested. The text messages between the defendant and Bp!!pul, who was apparently a male since the defendant referred to Bp!!pul as "my little brother" in one of the text messages, started on November 9, 2011, at 11:12 p.m., and continued through November 11, 2011, at 7:24 p.m. In 1 of the 10 text messages which were sent the night before the defendant's arrest, the defendant responded to Bb!!pul, "I'll tell you personally," when asked "[w]hat do you have there?" In the next text, Bb!!pul asked, "Old man do you have the money?"

The text messages which were sent and received on the date of the defendant's arrest started at 12:23 p.m., more than six

hours before the defendant would be arrested. The following 32 messages occurred in the time frame before the defendant's arrest. Only two text messages were sent and received around the time of the defendant's arrest. In a text message sent at 6:54 p.m., the defendant informed Bb!!pul that he would be there in five minutes, to which Bb!!pul responded, at 6:55 p.m., "Go into the restaurant there and give me a little bit because I won't be arriving on time."

During summation, the prosecutor used the content of the admitted text messages chart. The prosecutor began with explaining that the name of the contact, Bp!!pul, was inconsistent with the defendant's story that he was texting with his then-girlfriend. The prosecutor did not stop there.

Despite the Supreme Court instructing the prosecution that the text messages were only to be used to discredit the defendant's credibility, the prosecutor argued, "the text messages, I'm going to suggest to you, corroborate the defendant's possession of cocaine." The prosecutor went on to recount that the defendant began texting Bp!!pul the day before he was arrested to set up a meeting in the parking lot. The prosecutor stressed that the messages were "coded and secretive." The prosecutor continued by repeating the text messages in which the defendant is referred to as "old man," is asked "what do you have there?," and responded, "I'll tell you personally." Immediately after referencing the text messages setting up the meeting, the prosecutor directed the jury's attention to the fact that the defendant was found in possession of "over half a kilo of cocaine," and implied that the defendant was supplementing his income by selling cocaine. The subtext of the prosecutor's summation and the chart was to point the jury in the unmistakable direction that the case was about cocaine dealing and not cocaine possession.

On appeal, the defendant argues, inter alia, that the Supreme Court erred when it failed to suppress the cocaine recovered at the scene of the arrest at a pre-trial hearing. The defendant also argues that the court erred in admitting the chart of text messages into evidence on rebuttal because the messages pertained to a collateral matter and that the detective's testimony and the prosecutor's summation drew the unmistakable conclusion that the defendant was involved in uncharged cocaine sale crimes, which deprived him of a fair trial.

There are two fundamental bases upon which to reverse the judgment of conviction on the charge of criminal possession of a controlled substance in the first degree. The first ground for

reversal is the admission into evidence of the chart of unredacted text messages. Second, the cumulative effect of the extensive questioning of the arresting officer about narcotic sales in the area, the detective's testimony that one of the bags found in the defendant's possession may have contained prints of someone the defendant was "dealing with," the admission of the chart of text messages spanning two days in coded language setting up a meeting with a male individual, and the prosecutor's summation continuing the cocaine dealing narrative using the content of the admitted text messages, mandate reversal. When viewed cumulatively, these errors deprived the defendant of a fair trial (*see People v Calabria*, 94 NY2d 519, 523 [2000]; *People v Maier*, 77 AD3d 681, 682 [2010]; *People v Vasquez*, 120 AD2d 757, 758 [1986]; *People v Pippin*, 67 AD2d 413, 415 [1979]).

The Supreme Court erred in allowing the prosecutor to introduce as rebuttal evidence the content of the text messages. Such evidence violated the rule set forth in *Molineux* (*see People v Molineux*, 168 NY 264 [1901]; *People v Thomas*, 65 AD3d 1170, 1172 [2009] [admission of the visitor log book from prison evidencing the defendant's incarceration before and during the trial, to the extent relevant to a material fact, was an improvident exercise of discretion by the trial court since "whatever probative value it conferred was substantially outweighed by the danger that it would unfairly prejudice the defendant or mislead the jury"]; *People v Pippin*, 67 AD2d at 417 [the prejudice to the defendant resulting from improper cross-examination was "manifest" where the defendant was charged only with possession, not sale, of a controlled substance]) and went beyond the reasonable scope of rebuttal evidence as it sought to impeach the defendant's credibility with regard to a collateral matter (*see People v Harper*, 220 AD2d 450, 450 [1995]). The introduction of the content of the text messages was misleading and unduly prejudicial since it gave the jury the ability to accept the prosecution's not so subtle invitation to view the defendant as a cocaine dealer (*see People v King*, 115 AD3d 873, 875 [2014]; *see generally People v Wilkinson*, 71 AD3d 249, 256 [2010]).

"It is well established that the party who is cross-examining a witness cannot introduce extrinsic documentary evidence or call other witnesses to contradict a witness' answers concerning collateral matters solely for the purpose of impeaching that witness' credibility" (*People v Pavao*, 59 NY2d 282, 288-289 [1983]; *see People v Griffin*, 194 AD2d 738, 738-739 [1993]; *see also People v Ramos*, 139 AD2d 775, 776 [1988] ["We condemn

this attempt to associate the defendant with drug dealing through the use of unsubstantiated innuendo within the context of a wholly collateral matter"]).

The defendant was only charged with possession of a controlled substance in the first degree, wherein the sole elements were whether he knew he was in possession of the cocaine and the weight of the cocaine (*see* Penal Law § 220.21). The content of the text messages, starting from the night before the arrest, which are purportedly setting up a meeting for a deal, goes to neither knowledge of possession nor the weight of the cocaine. Had the text messages presented to the jury been limited to those exchanged around the time of the arrest, and then redacted to show only the contact name and telephone number of the person texted, their introduction for the limited purpose of rebutting the defendant's testimony that he was texting his then-girlfriend prior to being arrested would have been proper. Such evidence would have accomplished the People's stated goal of attacking the defendant's credibility on this issue and would have stayed within the limits set by the Supreme Court. However, the time span and content of the messages, specifically the language regarding the meeting and money exchange from the night before the arrest, goes to the suggested, unproven sale of cocaine.

The "general rule is that when a man [or woman] is put upon trial for one offense, he [or she] is to be convicted, if at all, by evidence which shows that he [or she] is guilty of that offense alone," and proof of other bad acts or crimes should be excluded to avoid jury misfocus (*People v Wilkinson*, 71 AD3d at 253 [internal quotation marks omitted]). Even if the evidence of the uncharged crime of criminal sale is offered for a legitimate purpose, absence of mistake or accident, "such evidence must be excluded if its potential for prejudice outweighs its probative value" (*People v Sayers*, 64 AD3d 728, 732 [2009]; *see People v Dorm*, 12 NY3d 16, 19 [2009]; *People v Molineux*, 168 NY at 293; *People v Maier*, 77 AD3d at 683; *People v Thomas*, 65 AD3d at 1172).

Contrary to the People's contention, the evidence of the text messages was neither offered nor admitted to corroborate the arresting officer's testimony or to "complete the narrative" of criminal cocaine possession. Rather, the evidence was introduced on cross-examination of the defendant (*People v Maier*, 77 AD3d at 682). Under the circumstances of this case, the text messages referencing the uncharged crime of criminal sale were not necessary to "sort out ambiguous but material facts" (*People v Resek*, 3 NY3d 385, 390 [2004]; *see People v Maier*, 77

AD3d at 682-683; *People v Wilkinson*, 71 AD3d at 249; *People v Foster*, 295 AD2d 110, 113 [2002]). The purpose of the meeting simply was not material to the prosecution of the cocaine possession charge.

In support of allowing the text messages into evidence, the majority relies on *People v Harris* (57 NY2d 335 [1982]). *Harris* is distinguishable from the facts of this case. The phone conversation evidence admitted in *Harris* was not collateral, as it was directly relevant to the issue of intent and could have been introduced in the prosecutor's direct case absent an authentication problem that was resolved when the defendant laid the proper foundation during her testimony (*see id.* at 345-346). Unlike the trial court in *Harris*, which providently exercised its discretion in allowing the phone conversation evidence on rebuttal, the trial court here correctly ruled that the text messages were not properly a part of the prosecutor's direct case prior to the trial (*see id.* at 345-346). In this case, defense counsel argued, in limine, that the content of the text messages had no probative value on the possession charge, was inadmissable hearsay, and that the prejudicial effect of portraying the defendant as a cocaine dealer was greater than any probative value, to which the trial court agreed. Therefore, it was error to then allow the text messages to be placed in evidence on rebuttal because the messages themselves served no purpose other than to reinforce the prosecutor's improper cocaine dealing theory of the case. There is a real danger that by giving the full content of the text messages, the jury was diverted from the case before them, which was more prejudicial than probative (*see People v Resek*, 3 NY3d at 389; *People v Rojas*, 97 NY2d 32, 37 [2001]; *People v Maier*, 77 AD3d at 683; *People v Pippin*, 67 AD2d at 417).

The cumulative effect of questioning the arresting officer about cocaine dealing, the cocaine dealing references in the detective's testimony, and the chart of text messages was further compounded when the prosecutor made improper remarks during summation which suggested that the defendant possessed the cocaine with an intent to sell it, even though this was not an element of the crime for which the defendant was on trial (*see People v Rowley*, 127 AD3d 884, 886 [2015]; *People v Pippin*, 67 AD2d at 415). To rule otherwise opens the door to prosecutors obtaining a conviction by using not only evidence germane to proving the elements of the crime charged but to bolster such evidence with proof that falls well outside of the strictures of *Molineux*.

The allusions to criminal cocaine dealing were not limited to

a solitary comment by the prosecutor. Rather, it was "the overarching theme of the prosecutor's summation" (*People v Gordon*, 50 AD3d 821, 822 [2008]). During summation, the prosecutor used the content of the text messages to illustrate that the defendant began setting up a meeting with a male individual in a parking lot using coded and secretive language, so he could "tell [him] personally" what he had there. The prosecutor immediately followed that narrative with the weight of the cocaine found in the defendant's possession. The prosecutor concluded by implying that the defendant must be supplementing his income with the sale of cocaine.

The prosecutor stated that the "texts are consistent with the defendant's possession of cocaine." This was disingenuous, at best, and misleading. The content within the text messages had nothing to do with the defendant's credibility relating to whom he was texting. Plainly, the text messages, testimony, and summation are equally if not more consistent with the defendant's sale of cocaine than his criminal possession of it. As the prosecutor's remarks were not responsive to the defense's summation, permissible rhetorical comment, nor were they a fair comment on the evidence, this case warrants reversal because of the cumulative prejudicial effect (*see People v Ashwal*, 39 NY2d 105, 109-110 [1976]; *cf. People v Gordon*, 50 AD3d at 822).

Although the majority correctly notes that defense counsel did not object during summation, summation arguments relating to the text messages are preserved for appellate review (*see* CPL 470.05; *cf. People v King*, 119 AD3d 819, 820 [2014]). During summation, the prosecutor referenced the content of the text messages, the admission of which defense counsel had specifically objected to twice during the trial. The trial court instructed the prosecution that the defendant's objections would be sustained if there was "any mention of any potential drug deal." Even though the prosecutor did not use the actual terms "drug deal" or "drug sale" in his summation, his use of the text messages and other evidence clearly left the jury with the unmistakable conclusion that cocaine sales were the key to the case.

Defense counsel correctly argued that additional objections during summation and curative instructions to the jury would have attracted even more attention to the prosecutor's portrayal of the defendant as a cocaine dealer. To the extent that claims as to the prosecutor's summation are not preserved for appellate review, this Court can and should reach them as a matter of discretion in the exercise of its interest of justice

jurisdiction (*see* CPL 470.15 [6] [a]; *People v Caparella*, 83 AD3d 730, 731 [2011]; *People v Ortiz*, 69 AD3d 490, 491 [2010]; *People v Gordon*, 50 AD3d at 822; *People v Prince*, 36 AD3d 833, 834 [2007]).

I do, however, agree with the majority that the Supreme Court properly denied the branch of the defendant's omnibus motion which was to suppress the physical evidence. When a police officer has probable cause to detain a motorist temporarily for a traffic violation, a seizure of the vehicle is reasonable (*see Whren v United States*, 517 US 806, 810 [1996]; *People v Robinson*, 97 NY2d 341, 349 [2001]; *People v Bookman*, 131 AD3d 1258, 1260 [2015], *lv granted* 26 NY3d 1112 [2016]). Here, the officer detained the defendant for a defective license plate light (*see* Vehicle and Traffic Law § 375 [2] [a] [4]) and missing rear-view mirror (*see* Vehicle and Traffic Law § 375 [10] [a]), and because the cocaine was observed in plain view on the floor of the car between the defendant's legs, the cocaine was lawfully seized (*see People v Edwards*, 82 AD3d 1005, 1006 [2011]).

Accordingly, I would vacate the conviction of criminal possession of a controlled substance in the first degree and the sentence imposed thereon, and remit the matter to the Supreme Court, Suffolk County, for a new trial on that count of the indictment.